IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
Western Division

_____

| | |
|---|---|
| A.C., by her next friend and mother, J.C., her father, B.C.; and J.C. and B.C., the parents, Individually. | § § § § |
| Plaintiffs, | |
| vs. | Case No. 2:10-cv-02347-dkv |
| | JURY DEMANDED |
| SHELBY COUNTY BOARD OF EDUCATION; | |
| Defendant. | |

_____

**FIRST AMENDED COMPLAINT**
_____

**I.   PRELIMINARY STATEMENT**

    1.    This is an action by A.C., a seven-year old student with Type I diabetes and severe food allergies who was being schooled at a Shelby County public elementary school in Arlington, Tennessee known as Bon Lin Elementary, and her parents, J.C. and B.C.  They seek protection against and damages for retaliatory action taken by the Shelby County Board of Education ("the Board") in response to their federally protected complaints to the Board and to the United States Department of Education's Office of Civil Rights (OCR).

2. The Board's actions, set forth more fully herein, violate section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and Title II of the Americans with Disabilities Act (ADA, ADA-AA), 42 U.S.C. §12131.

3. For relief, Plaintiffs seek injunctive remedy of non-retaliation, along with compensatory damages for the significant emotional and financial harm caused by the Board, as well as attorneys' fees and costs.

## II. PLAINTIFFS

4. The Plaintiffs are A.C, a seven-year old student of the Board, and her parents, J.C. and B.C.

5. Plaintiffs are residents of Shelby County, Tennessee, and citizens of the United States. They live in Arlington, Tennessee.

## III. DEFENDANT

6. Defendant, Shelby County Board of Education, is organized under the laws of Tennessee. It is a local education authority, and it is responsible for avoiding discrimination on the basis of disability, for providing related aids and services to students with disabilities, for complying with Tennessee law, including Tenn. Code Ann. §49-5-415 for diabetes, and for resisting retaliation against persons who make good faith complaints of discrimination/retaliation/failure to accommodate.

7.	The Board is bound by the Americans with Disabilities Act,1 and its amendments, as well as section 504 of the Rehabilitation Act.2

## IV. JURISDICTION AND VENUE

8.	This action arises under the laws of the United States, and therefore this Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

9.	This action also arises under the following federal statutes: The Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 et seq., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title II of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. §12132 (Supp.1991), the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA.  Both the ADA and §504 prohibit retaliation against persons with disabilities, or persons who advocate on behalf of a student's education or who have filed a complaint with the Office of Civil Rights (OCR).

10.	Venue is properly in this Court pursuant to 28 U.S.C. §1391, in that all parties reside in this Judicial District and the matters at issue arose in this Judicial District.

---

1	The Board is a covered "public entity" under the ADA. Title II's definition of "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. 12131(1)(B).

2	Similarly, the Board is covered by the Rehabilitation Act because it receives federal financial assistance.

3

## V. LEGAL AND FACTUAL BASES FOR THIS LAWSUIT

11. Cast in negative terms, Section 504 of the Rehabilitation Act, 29 U.S.C § 794, bars all federally funded entities (governmental or otherwise) from discriminating on the basis of disability. Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

12. Defendant receives federal financial assistance and is covered by Section 504.

13. The Americans with Disabilities Act of 1990, at 42 U.S.C. § 12132, with its Amendments effective January 1, 2009, extends the nondiscrimination rule of section 504 of the Rehabilitation Act to services provided by any "public entity" (without regard to whether the entity is a recipient of federal funds).

14. Title II of the ADA prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. § 12132 (Supp.1991), provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

15. Both 504 and the ADA prohibit retaliation against any person who has advocated on behalf of a child's education, or participated in a proceeding concerning the child's education.

16. Plaintiff A.C. has "Type 1" diabetes, formerly known as "juvenile diabetes" or "insulin dependent diabetes." Type 1 diabetes is a disease in which the body (the pancreas) does not produce insulin. Persons with Type 1, like A.C., must receive insulin injections or use an insulin pump to stay alive. A.C. uses an insulin pump worn at the waist with infusion at the hip or buttocks area. She utilizes a blood glucose monitor, and receives insulin to assist with her blood glucose level.

17. Additionally, Plaintiff A.C. has severe food allergies, particularly allergies to peanut products. She wears a medic-alert bracelet to notify others of her allergies. She also carries an "Epipen Jr.," a small device filled with Epinephrine (an adrenaline) to treat allergic reactions.

18. Due to her diseases and conditions, Plaintiff A.C. is "disabled," owing to the substantial limitations to her endocrine function (a "major bodily function") caused by her Type 1 Diabetes, as well as the substantial limitations to, *inter alia*, her major life activity of "eating," "digestion," "learning," "breathing," and "caring for herself" caused by her diabetes and severe food allergies. 42 U.S.C. 12102(2). Indeed, without mitigating measures of insulin and/or epinephrine, Plaintiff A.C. would *die* and, therefore, be substantially limited in *all* major life activities. Accordingly, Plaintiff A.C. needs various reasonable accommodations in the school setting, including assistance with diabetes care, opportunity for frequent monitoring and self-care, avoidance of certain food products and, to be ensured of educational opportunity, testing in the classroom (not outside the classroom).

19.     According to the school principal at Bon Lin Elementary School, Kay Williams, for years the Bon Lin Elementary School operated without a permanent school nurse. According to Williams, if a nurse were needed, the response would be "call the parent or call 911."

20.     Initially, when A.C. was to enroll in school at Bon Lin, Williams advised the family of A.C. that if anything happened to their Type I diabetic daughter, they would call the parent or call 911. Williams stated there would be no nurse at the school.

21.     At the time she was to enroll, Bon Lin did not have written protocols or policies specific to accommodating children with diabetes in the school. As a result, administrators and parents did not have formal, written guidances on these subjects.

22.     A.C.'s parents made a written request for a full time nurse on staff at Bon Lin, that testing should occur within the classroom, and that an Epi-pen should remain with her daughter.

23.     Beginning in 2007, the parents, Plaintiffs J.C. and B.C., engaged in protected activity under the ADA-AA and section 504. They complained, internally to the school system, and externally to the Office of Civil Rights (OCR), that the school system was engaging in discrimination against their daughter, A.C., on the basis of her disabilities. The complaint of discrimination included, *inter alia*, (1) refusing to provide A.C. an education to come to school because of her disability and the school's unpreparedness to meet her needs; (2) suggesting A.C. be segregated through transfer to a different school where a nurse would be present; (3) refusal to administer the Glucagon shot; (4) generally, being *so* ignorant of A.C's needs in terms of testing and monitoring of diabetes, and safeguarding A.C. from peanut products, as to endanger the child's welfare; and (5) demanding testing outside the classroom.

24. Additionally, J.C. and B.C. complained about the lack of a peanut-free classroom. These complaints resulted in letters from the school system to fellow parents, making them aware of the potentially life-threatening allergy of A.C., and making them sensitive to the avoidance of peanut-free products. It also resulted in accommodations in the cafeteria and by A.C.'s teacher monitoring the lunchroom, as well as a peanut-free classroom.

25. A.C. and B.C.'s protected activity, their complaints, were met with resistance and, ultimately, reprisal.

26. In August of 2007, Kay Williams, the principal of Bon Lin elementary school, intended to leave a private voice mail message with a nurse, Barbara Duddy, of the Shelby County Health Department. However, Ms. Williams mistakenly left the voice mail message upon J.C.'s voice mail. Williams stated that J.C. was "out to lunch," "does not reason or have any common sense," and otherwise belittled J.C.

27. Kay Williams did state, in reference to a 504 meeting, quote:

Hey Barbara, um, I know we are having a meeting tomorrow about Ms. [C.]. This is Kay Williams from Bon Lin. She is here causing all kinds of confusion and Sanji has already broken down and cried. Um, this woman is out to lunch. Um, my teacher had ten minutes for lunch because she is trying to make sure there are no peanut people by her and now she claims the kid did sit by her with peanut butter. I mean, yet she doesn't want the child sitting at another table because she doesn't want her singled out. Um, I don't know what to do with this lady anymore. She does not reason or have any common sense. So you, know, that, uh, since I am the one with common sense, I am going to have a little problem with her. But at any rate, love ya, and I'll see you tomorrow, unless you want to call . . . 937-3382. Bye.

28. Plaintiffs continued to work closely with the Office of Civil Rights (OCR), given the continuing non-compliance and intransigence from the school. OCR warned Plaintiff about how the school's response, particularly due to the attitude expressed by the principal's voice mail, was defensive in nature.

29. By 2008, due to Plaintiffs' federally protected complaints, and their work with OCR, the Board had agreed to take class-wide corrective actions for its conduct. The corrective action included, generally, the development of a procedure for school administrators to follow permitting students to have blood glucose levels tested and monitored in the classroom and, when necessary, to take appropriate action such as administering insulin or allowing the child to eat a snack. It also included permission for students with diabetes to self-test in any place, at any time, in school, or during a school-sponsored activity. Students could also carry diabetes testing equipment and have access to food and water, as needed.

30. These protocols and polices were put in writing, for the first time, thereby assisting children with diabetes by providing critical information to administration and parents.

31. The Board also agreed to modify its students' rights and equal opportunity policies. The Board provided copies of its policies to OCR in December of 2008.

32. Additionally, effective December 10, 2008, the Board adopted a policy for "Accommodating Students with Diabetes," which set forth applicable Tennessee law, the right to an Individual Health Plan, the Parent's Rights and Responsibilities, the role of School Volunteers and Blood Glucose Monitoring, School Responsibilities to Students with Diabetes, and Student's Rights.

33. Clearly, the school system knew of Plaintiffs' history of complaints about inadequacy of the Board's policies and care toward A.C., and the Plaintiffs' complaints to OCR.

34. On or about July 23, 2009, OCR completed its review and monitoring of the Plaintiffs' complaints. This followed receipt of reports from the Board dated December 2, 2008, January 30, 2009, and April 2, 2009. OCR indicated that the Board had fully complied with the agreements to date, and that no further monitoring was required relative to Plaintiffs' triggering complaint.

35. Defendant uses contract nurses from the Shelby County Health Department. These nurses did not have a direct reporting line to Defendant and Defendant did not have the authority to discipline them.

36. In August of 2007, the nurses, through their director of the Shelby County Health Department, simply refused to administer insulin to A.C. Instead, they claimed that the mother, J.C., would have to "come to the school" and administer the insulin herself. As for keeping peanuts out of the classroom, even though it could cause severe harm or death, the director took the attitude of "we can't control what parents bring in."

37. Not having been accustomed to the diabetes care and management being requested by A.C. and her family, as well as by the policies and protocols following OCR's involvement, these nurses would complain of "liability" concerns for the care of A.C.

38. These so-called "liability" concerns continued into February of 2009, notwithstanding state immunity law for nurses operating in a school setting. See Tenn. Code Ann. 49-5-415(a)(3)

39. While the Board begrudgingly complied with certain obligations, it did seek reprisal against Plaintiffs within a few months of OCR's ceasing to monitor the Board's compliance with the agreements with OCR.

40. On August 19-20 2009, which would have been the beginning of A.C.'s second grade year, Defendant planned to place A.C. on "homebound services" at the recommendation of Shunji Brown Woods, Defendant's Director of Coordinated School Health. Homebound services is a program which removes children from the educational facility itself and provides the education at their home. This planned was ultimately rejected, though the parents were never consulted about it.

41. A.C.'s second grade teacher was Mrs. Amy Carver.

42. The science and management of Type I diabetes for a second grade child requires training and knowledge to avoid ignorance and resulting fear. According to Mrs. Carver, the school system did not provide her training on the care and management of a child with Type I diabetes in the classroom. She was told by the assistant principal to keep an "internal" log by writing down blood glucose numbers for a record.

43. Mrs. Carver describes a good working relationship with the family of A.C. Friendly emails were regularly traded concerning A.C.'s assignments, care, and foods in the

classroom. This included special parties such as birthdays, Halloween, Thanksgiving, and Christmas.

44. On or about October 27, 2009, a section 504 meeting was held concerning A.C. which the parents, J.C. and B.C., attended.

45. Additionally, on or about October 29, 2009, B.C. met with the assistant principal of Bon Lin elementary, Thomas McClellan. The purpose of this meeting was to review and answer questions about A.C.'s 504 Health Plan. The two reviewed A.C.'s Health Plan and revisions to it. This plan, which Defendant allowed to be written by the parents (and bore the name "parent written," as entered by Mr. McClellan), set forth information about medications and equipment at school, expiration dates, the daily schedule, target ranges, times of testing, CGMS monitoring procedures, signs and symptoms of problems, as well as allergy-related concerns. A recent addition was requesting that the school nurse, Ms. Connie Brown, *not* test A.C. in a clinic because sick children were treated in that clinic and A.C.'s fragile immune system could contract illness. Additionally, B.C. explained that A.C. would have highs in the morning, having just eaten breakfast.

46. While the 504 Health Plan was ironed out between B.C. and the assistant principal, it was met with further resistance by the Shelby County nurse, Ms. Connie Brown. The nurse wanted it "approved by the Board attorney."

47. The day after the review of the 504 Health Plan, October 30, 2009, Ms. Williams contends that A.C.'s second grade teacher, Mrs. Carver, came to her office crying.

48.     According to Ms. Williams, J.C. and B.C. became "very argumentative" while talking with Mrs. Carver in a conference.   According to Ms. Williams, Mrs. Carver was suffering the "constant harassment" of J.C. and B.C.   According to Ms. Williams, Mrs. Carver expressed concerns about the glucose levels for A.C. based on logs kept of her levels *during classroom hours.*

49.     On that same day of October 30, 2009, Defendant reported J.C. and B.C. to the Department of Children's Services under the "brutality, abuse, or neglect" statute. See Tenn. Code Ann. 37-1-403.

50.     Mrs. Carver, the second grade teacher, completely disputes Ms. Williams account of the events of October 30, 2009.

51.     According to Mrs. Carver, on October 29, 2009 and October 30, 2009, Mrs. Carver and J.C. exchanged pleasant emails concerning a Halloween party on October 30, 2009. According to Mrs. Carver, the day of October 30, 2009 progressed like any other, the party went as planned, and Mrs. Carver went home at the end of the day.   She had no knowledge that Defendant reported Plaintiffs for brutality, abuse or neglect on that day.

52.     Mrs. Carver, who was pregnant in the fall of 2009, simply did not suffer an "anxiety attack" on October 30, 2009.   Rather, she experienced stress from the monitoring obligation of A.C., but at no time did she state that A.C.'s family was harassing her, that they were untoward in their words, or that they did not care for their child.

53. Mrs. Carver never stated, intended, or conducted herself in any manner to imply that A.C. or B.C. did not care for their child or *wanted* something bad to happen to their child. Rather, Mrs. Carver's husband is an EMT, and he expressed concerns to Mrs. Carver about A.C.'s blood glucose levels which Mrs. Carver was recording on her own logs.

54. The content of Defendant's report to DCS was inflammatory, false, and not made in good faith.

55. Without proper context or fact, Defendant stated to DCS:

* The child's diabetes is not being monitored at home;

* That A.C. "suddenly crashes" almost every day [while at school];

* The child is sent to the facility with cookies, Kool-Aid, and candy;

56. Subsequently, Defendant also stated to DCS:

* That A.C.'s parents do not give checks on her blood levels;

* The family wants something horrible to happen to A.C. at school;

* That the child could die and the family is looking for a lawsuit;

57. Defendant's claim that J.C. and B.C. were not testing or monitoring their child was patently false, knowingly or recklessly false, and the records from the CGMS monitor showed this falsity, along with parent's finger testing and diligence. The so-called "erratic levels" were

actually taken *during school* hours—while the *school, not parents,* were monitoring and testing the child. Indeed, the log records were kept *during school* hours. Defendant did not even bother to seek information from the CGMS pump (which recorded all hours)—and Plaintiffs had even brought in training to the school *about this pump and its readings.* Further, Defendant's claim that the parents wanted something horrible to happen to the child is totally belied by these parents' work with OCR, their seeking of accommodations (including a school nurse, proper testing, and written guidances for parents and administrators), their writing of the 504 Health Plan, and their meetings with the school (including the last meeting on October 29, 2009, with B.C., the very day before the report).

58. On the evening of October 30, 2009, at approximately 7:00 p.m., the State of Tennessee's Department of Children's Services (known as "Child Protective Services," or "CPS"), arrived unannounced at Plaintiffs' home. CPS stated they had been referred based upon emergency circumstances of "medical maltreatment" of A.C. by the parents, J.C. and B.C.

59. The allegations of emergency circumstances of medical maltreatment were false, defamatory, made in bad faith, and for intentionally retaliatory purposes by the Board.

60. The allegations and the investigative process, though totally unfounded, did cause A.C., J.C. and B.C. to suffer severe emotional distress. J.C. and B.C. were required to hire an attorney, undergo lengthy investigation, and read and consider frightening CPS literature about the CPS investigative process which included the prospect of losing their child. They required assistance from their physician, and weathered investigative bureaucracy while fearing a worst-case scenario. The process also frightened A.C.

61. On or about November 12, 2009, Plaintiff A.C.'s treating endocrinologist, Dr. Kashif A. Latif, wrote a letter in support of A.C.'s parents, stating in relevant part:

> [A.C.'s] diabetes care from her family has been very appropriate. Her parents are following protocol for diabetes control and insulin pump management. They also make sure that she attends her appointments regularly.
>
> [A.C.'s] mother asked me to write this letter, as there is a concern regarding the child's care. From my perspective the care provided by her parents is completely appropriate. There is no neglect in caring for this disease, which is difficult to handle in a child this age.

62. On or about December 15, 2009, CPS made written findings that the case was **"UNFOUNDED for abuse/neglect."**

63. Plaintiffs continue to fear that the Board will take further retaliatory action against them due, in part, to the principal's voicemail, the actions and attitude of the school (and contracted nurses) concerning services, and culminating in the blatantly false CPS report. As a result, and without injunctive and protective relief, the parents have been forced to remove A.C. from Bon Lin Elementary School and is being homeschooled.

64. Plaintiffs now file this suit in this United States District Court to address Defendant's retaliatory actions against these Plaintiffs.

## V. LEGAL CAUSES OF ACTION

65. The foregoing paragraphs are incorporated herein.

66. Based thereon, Plaintiffs bring the following legal causes of action against the Board:

      **A.**      **<u>Retaliation under Section 504 of the Rehabilitation Act;</u>**

      **B.**      **<u>Retaliation under Title II of the ADA/ADA-AA</u>.**

67.    Plaintiffs respectfully pray for the following relief:

    a.    Injunctive relief proscribing any further retaliation against A.C. or her parents, J.C. and B.C;

    b.    An award of appropriate compensatory damages under the ADA and Rehabilitation Act (or either of them), for the intentional and retaliatory violation of Plaintiffs' rights; and

    c.    An award of costs and reasonable attorneys' fees.

68.    A TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully Submitted,

**GILBERT RUSSELL McWHERTER, PLC**

<u>/s Justin S. Gilbert</u>
Justin S. Gilbert (TN Bar No. 017079)
Jonathan L. Bobbitt (TN Bar No. 23515)
Jessica F. Salonus (TN. Bar No. 28158)
101 N. Highland Ave.
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com
jbobbitt@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

On this date, February 9, 2011, I certify that a copy of the foregoing First Amended Complaint was served upon defense counsel, below, through the Court's electronic service filing system.

Valerie Speakman,
Shelby County Board of Education
160 S. Hollywood St., Rm. 250
Memphis, TN 38112-4801
ATTORNEY FOR DEFENDANT

/s Justin S. Gilbert_____