IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

A.C., by her next friend and Mother,
J.C., her Father, B.C., and J.C. and
B.C., the parents, Individually,

      Plaintiffs,                             Case No.:  2:10-cv-02347-dkv

vs.

SHELBY COUNTY BOARD OF EDUCATION,

      Defendant.

DEFENDANT, SHELBY COUNTY BOARD OF EDUCATION'S,
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant, Shelby County Board of Education (hereinafter referred to as "SCBE") and presents this Memorandum in Support of its Motion for Summary Judgment.[1]

## I.  INTRODUCTION

This is a retaliation claim brought pursuant to "Section 504 of the Rehabilitation Act" and "Title II of the ADA/ADA-AA".  (Plaintiffs' Amended Complaint, p. 16)  Plaintiffs allege that the SCBE retaliated against them in **2009** because they filed a discrimination claim with the Office of Civil Rights in **2007** and because they made "complaints" to the Board on unspecified dates.  (Plaintiffs' Amended Complaint at p. 1, p. 6)

---

[1] Excerpts of depositions cited herein and Affidavits cited herein are attached hereto as Exhibit A.  The SCBE's Statement of Undisputed Material Facts is attached hereto as Exhibit B.

## II. <u>FACTS</u>

The Plaintiffs are A.C., B.C. and J.C.   A.C. is a former student of Defendant, Shelby County Board of Education.   A.C. has Type I diabetes and a peanut allergy.   B.C. and J.C. are A.C.'s father and mother respectively.

J.C. has four children, S.C. who is approximately 2 years old, A.C. who is 8 years old, C.C. who is 10 years old, and C.T. who is 17 years old.   C.T. began attending schools operated by the SCBE when he was in 7th grade.   When he was in 8th grade a Section 504 plan was written for C.T. because he was diagnosed as having Attention Deficit Hyperactivity Disorder.   (J.C. Dep. at 168-169:22-23)   B.C. testified that the Section 504 meeting he attended on behalf of C.T. was, "great".   (B.C. Dep. at 36-37:10-12)   C.T. presently attends Arlington High School, a school operated by the SCBE.   (B.C. Dep. at 38:15-22)   C.T. is doing well in school and Plaintiffs have not had any problems with Arlington High School.   (J.C. Dep. at 42-43:3-20)

C.C. began attending schools operated by the SCBE when he was in kindergarten.   He attended Lakeland Elementary School during his kindergarten year and was re-zoned to Bon Lin Elementary School (Bon Lin) for his first grade year.   C.C. remained at Bon Lin until his parents withdrew him at the commencement of the 2010-2011 school year in order for him to be homeschooled.   (B.C. Dep. at 57:12-14)   According to J.C., C.C. has never been mistreated by the SCBE.   (J.C. Dep. at 171:13-21)

Defendant, Shelby County Board of Education (SCBE) serves approximately 47,000 students, 11,108 of which have a "disability" within the meaning of the Americans with Disabilities Act.   (Shunji Brown-Woods' Affidavit)   One of the schools operated by the SCBE is Bon Lin Elementary School ("Bon Lin").   During the 2007-2008 school year the Principal of

Bon Lin was Kay Williams.[2]  Ms. Williams retired from the SCBE on June 30, 2010.  Prior to her retirement, Ms. Williams had been an educator for 38 years, 22 years of which were spent as a Principal.  (Kay Williams Dep. at 8-9:2-1; 34-35:20-1)  During the 2007-2008 school year and continuing to present, Tom McClellan has been an Assistant Principal at Bon Lin.[3]  (Tom McClellan Dep. at 5:17-21)  Assistant Principal McClellan was the Section 504 Coordinator for Bon Lin in 2007 and continues to serve in that capacity to present.  (Tom McClellan's Affidavit)

In 2007 and continuing until the 2011-2012 school year, nurses assigned to SCBE schools were employed by the Shelby County Health Department (Health Department).  (Shunji Brown-Woods Dep. at 10:12-21)  As of 2007, the Health Department with the assistance of the SCBE's Department of Exceptional Children made decisions regarding the placement of nurses based upon the needs of students with disabilities.  (Shunji Brown-Woods Dep. at 10:12-24)  As of 2007, school Principals did not have the authority to assign nurses to their schools.  (Kay Williams Dep. at 33-34:19-14)  During Kay Williams' 22 years as a Principal she never had a full-time school nurse assigned to the schools at which she was Principal until August, 2007.  (Kay Williams Dep. at 34-35:9-7)  In 2007 there were only 32 nurses providing services to the SCBE's schools.  (Shunji Brown-Woods Dep. at 12:15-16)  In 2007 and continuing until present the SCBE had no authority to hire, fire or discipline Health Department nurses.  (Kay Williams Dep. at 66:4-13; Shunji Brown-Woods Dep. at 45:22-25; Shunji Brown-Woods' Affidavit)

One week prior to the commencement of the 2007-08 school year Health Department Charge Nurse Barbara Duddy,[4] and Health Department Registered Nurse, Constance (Connie)

---

[2] Principal Williams was conferred a Master's Degree in Guidance and Counseling and a "Post-Masterate" in Administration.  (Kay Williams Dep. at 9:21-24)
[3] Assistant Principal McClellan was conferred a Bachelor of Science Degree in 1994.  He was conferred a Master's in Educational Psychology in 1998 and is presently working on his Doctor of Education Degree.
[4] Nurse Duddy has been a Registered Nurse for 53 years.  She began working for the Shelby County Health Department as a school nurse in 1988 and became a Charge Nurse for the Shelby County Health Department in 1994.

Brown visited the home of the Plaintiffs, which was protocol for any new student with a physical disability. (Barbara Duddy's Affidavit) B.C.. was not at home during the visit. (B.C. Dep. at 120:10-21) During the meeting J.C. informed Charge Nurse Duddy that a full-time nurse needed to be provided at Bon Lin to care for A.C. and that she wanted Bon Lin to be a "peanut-free" school. During the home visit Charge Nurse Duddy asked J.C., who did not work outside the home, if she would be willing to accompany A.C. to school during the first week in order to familiarize nurses with A.C.'s insulin pump. J.C. agreed. (Connie Brown's Affidavit; Barbara Duddy's Affidavit) Also, as is protocol for the Shelby County Health Department, Charge Nurse Duddy advised J.C. that the Health Department would need signed doctor's orders pertaining to A.C.'s medical needs. (Barbara Duddy's Affidavit; Connie Brown's Affidavit)

At the time J.C. made the request for a full-time nurse to be assigned to Bon Lin, the Health Department had already assigned its limited nursing staff; they had originally planned for a part-time nurse to be assigned to Bon Lin. (Barbara Duddy's Affidavit) However, after conferring with SCBE Assistant Superintendent, Maura Sullivan, the Health Department agreed to place a full-time nurse at Bon Lin. Until the nursing assignments could be modified to place a full-time nurse at Bon Lin, during the first week of school, Health Department Charge Nurse Duddy and Health Department Nurse Brown were temporarily assigned to Bon Lin. (Barbara Duddy's Affidavit; Kay Williams Dep. at 51:1-4) At least one nurse has been present at Bon Lin during the entire school day from the first day of the 2007-08 school year, *i.e.* August 20, 2007 until present. (Kay Williams Dep. at 31:9-18; Tom McClellan's Affidavit; Barbara Duddy's Affidavit) Principal Williams was "thrilled" to have a full-time nurse assigned to her school. (Kay Williams Dep. at 35:4-7)

On August 22, 2007 Principal Williams left a voicemail for who she thought was Health Department Charge Nurse Duddy, but who turned out to be J.C. (Plaintiffs' Amended Complaint, p. 7)  The content of the voicemail was as follows:

> Hey, Barbara.  I know we're having a meeting tomorrow about Ms. [C].  This is Kay Williams from Bon Lin.  She is here causing all kinds of confusion and Sanji has already broken down and cried.  This woman is out to lunch.  My teacher had 10 minutes for lunch because she's trying to make sure there are no peanut people by her and now she claims the kid did sit by her with peanut butter.  I mean, yet she doesn't want the child sitting at another table because she doesn't want her singled out.  I don't know what to do with this lady anymore.  She does not reason or have any common sense.  So you know that since I am the one with common sense, I am going to have a little problem with it.  But at any rate, I love ya, and I'll see you tomorrow, unless you want to call . . .  937-3382.  Bye.

Ms. Williams' voicemail was based upon her frustration that when she met with J.C. she thought they had come to an agreement concerning accommodations for A.C. and after their conversations concluded J.C. would, "call and say something else."  (Kay Williams Dep. at 49:7-24; 53:12-20)  In Ms. Williams' view, "the comments and the expectations were changing quite often."  (Kay Williams Dep. at 49:19-24)  According to J.C., she (J.C.) had not contacted the Office of Civil Rights (OCR) as of the date that Ms. Williams left the voicemail message.  (J.C. Dep. at 125:7-12)

On August 23, 2007 a meeting was held with SCBE Student Services Specialist and Section 504 Coordinator, Angela Hargrave,[5] Health Department Supervisor Kathleen Johnston,

---

[5] Ms. Hargrave was SCBE's Section 504 Coordinator in 2007 and continuing throughout the time that A.C. attended Bon Lin.  (Angela Hargrave's Affidavit)  Ms. Hargrave has devoted her entire professional career to serving the needs of students with disabilities.  Ms. Hargrave was conferred a Bachelor's Degree in elementary and special education in 1993.  Ms. Hargrave taught students with disabilities from 1993 through 2000 and began serving as a school level Section 504 Coordinator in 1993.  In 2000 Ms. Hargrave was conferred a Master's Degree in Administration and Supervision K-12.  In 2000 Ms. Hargrave became a Special Education Coordinator and was responsible for coordinating and managing disability programs at 6 SCBE schools.   In 2005 Ms. Hargrave was assigned to a middle school Assistant Principal position; her job duties included serving as her school's Section 504 and IDEA Compliance Testing Coordinator.  In 2004 Ms. Hargrave was conferred an Educational Specialist Degree in Curriculum and Supervision.  In 2006 Ms. Hargrave was promoted to SCBE Student Services Specialist and was assigned to be SCBE's district-wide Section 504 Coordinator.  In 2009 Ms. Hargrave was promoted to the position of Director of Student Services; a position which she holds to this date.  (Angela Hargrave's Affidavit)

Principal Williams, B.C., J.C., Health Department Charge Nurse, Duddy, A.C.'s kindergarten teacher, Sandra Waller, and Assistant Principal, McClellan. (Kay Williams Dep. at 37:14-22; Kay Williams Dep., Ex. 3) The purpose of the meeting was to discuss J.C.'s concerns about A.C.'s care while at school. (Tom McClellan's Affidavit) The minutes of the meeting reflect that the first order of business was that Principal Williams stated that the focus needed to be on A.C. and her well-being at the school and that Principal Williams wanted A.C. to be at Bon Lin. Principal Williams then, "apologized for her frustration and message, which was left on J.C.'s phone." (Kay Williams Dep., Ex. 3; Tom McClellan's Affidavit) The minutes of the meeting reflect that near the end of the meeting Ms. Williams again apologized for the message and stated that, "she was not angry." (Tom McClellan's Affidavit) A large portion of the meeting involved A.C.'s peanut allergy. J.C. and B.C. wanted the entire school to be "peanut-free" and to require that any child in the school that brought peanut products into the school would receive a disciplinary action. (J.C. Dep. at 128; 15-18) J.C. informed the attendees at the meeting that A.C. had never had a peanut reaction. (Kay Williams Dep., Ex. 3; Tom McClellan's Affidavit) Although J.C. insisted that the entire school be "peanut-free" and that any student at Bon Lin found to have a peanut product be disciplined, J.C. and B.C. admitted in their depositions that A.C. is exposed to peanut products wherever she goes, including but not limited to a cruise, in an airplane, in hotels and movie theaters. (J.C. Dep. at 98-100:8-11; B.C. Dep. at 34-36:5-9) Prior to the August 23, 2007 meeting Principal Williams had not been notified that an OCR complaint had been filed. (Kay Williams Dep. at 37-38:23-3)

It was not until August 24, 2007 that SCBE received notice that J.C. had filed an OCR complaint. On that date SCBE Assistant Superintendent, Maura Sullivan received an e-mail from the SCBE Superintendent, Dr. Bobby Webb, notifying her that he (Dr. Webb) had received

a telephone call from the OCR on that day.   In the e-mail Dr. Webb assigned Assistant Superintendent Sullivan the responsibility of investigating and responding to the complaint. (Maura Sullivan Dep., Ex. 1; Maura Sullivan Dep. at 8-9:11-20)  School Principals of the SCBE do not handle OCR complaints.  (Maura Sullivan Dep. at 61-62:19-12; Kay Williams Dep. at 38:4-9)  It was not until late in September of 2007 that Ms. Williams was advised by Ms. Sullivan that an OCR complaint had been filed.  (Kay Williams Dep. at 71:6-11)  Prior to this lawsuit being filed Ms. Williams was unaware of the allegations that were made in the OCR complaint.  (Kay Williams Dep. at 73:20-22)  Principal Williams never saw the OCR complaint nor did she ever see the SCBE's response to the complaint.  (Kay Williams Dep. at 38:10-17; 74:12-21; 97-98:20-1)   Ms. Williams was unaware of the OCR's findings about the C.'s complaint and was unaware of the final monitoring requirement in the OCR Resolution Agreement.  (Kay Williams Dep. at 76:18-21; 97-98:20-1)

Every SCBE student with a Section 504 qualifying disability has an Individualized Health Plan (IHP).   IHPs are usually drafted by Shelby County Health Department nurses. (Shunji Brown-Woods Dep. at 29:2-11)  Originally an Individualized Health Plan (IHP) was written for A.C. by Health Department nurses; however, J.C. did not like the plan so she wrote her own plan for A.C.  (Connie Brown Dep. at 27:4-25; Connie Brown Dep., Ex. 3)  SCBE protocol requires that IHPs must be updated annually to include any new information about the student's care, the student's new age, new teacher class assignments, new weight, change in physician, etc.  (Shunji Brown-Woods Dep. at 31-32:21-15)  It is SCBE protocol that the IHP must be signed by the student's physician.  (Shunji Brown-Woods Dep. at 35:11-13)  The Shelby County Health Department follows "Best Practice" and requires that they are provided signed doctor's orders as a condition precedent to providing nursing services, such as tracheostomy

care, tube feeding, catheterization, and diabetes care, for students requiring such services. (Barbara Duddy's Affidavit)  At a Section 504 meeting in November, 2007 A.C.'s parents presented the SCBE with their Parent Written IHP for A.C.  (Connie Brown Dep., Ex. 3; Tom McClellan's Affidavit)  Ms. Hargrave, Assistant Principal Herrle, Charge Nurse Duddy, J.C., B.C., Ms. Waller and Assistant Principal McClellan were present at the meeting.  (Tom McClellan's Affidavit)  At the meeting, B.C. expressed concerns about A.C.'s failure to master certain subjects and it was discussed that A.C. was behind in academics.  (B.C. Dep. at 93-95:11-2; Tom McClellan's Affidavit)

A.C.'s first grade teacher at Bon Lin was Laura Richardson.  In first grade, A.C. continued to struggle academically.  In a letter to Ms. Richardson dated September 24, 2008 J.C. expressed concern about the "F's" A.C. was receiving and the fact that A.C. could not read. (J.C. Dep., Ex. 29; J.C. Dep. at 181:7-19)

Ms. Richardson received a copy of A.C.'s IHP for the 2008-2009 school year and she and J.C. went over the plan.  (Laura Richardson Dep. at 26:2-24)  The IHP provided that A.C.'s "Target Blood Glucose Range" should be between 70 and 170.  (J.C. Dep., Ex. 10)  A.C. wore a sensor and insulin pump when she was in Ms. Richardson's classroom.  The sensor would alarm when A.C.'s blood glucose levels measured below or above acceptable blood glucose levels. (Laura Richardson Dep. at 22-23:25-10)   "When it (the sensor) alarms, it tells you that something's wrong."  (B.C. Dep. at 140:16-25)   Each time the alarm would sound Ms. Richardson was required to call the school nurse. (Laura Richardson Dep. at 23:6-10)  The pump would alarm approximately 5 times per day on the average, but had alarmed as many as 10 times in a day according to Ms. Richardson.  (Laura Richardson Dep. at 28-29:20-17)

A.C.'s Parent Written IHP for the 2008-2009 school year also referenced A.C.'s peanut allergy.  The IHP acknowledged that the school agreed to make A.C.'s classroom/lunch table "peanut-free", that all of the parents of students in A.C.'s class were sent letters informing the parents that peanuts were prohibited from being sent to school, that the classroom was "peanut-free", and that the cafeteria staff would wipe down the tables before A.C.'s class came into the cafeteria.  (Tom McClellan's Affidavit; J.C. Dep., Ex. 10)

A.C. was only permitted to eat foods brought from home during the school day.  (J.C. Dep., Ex. 10; B.C. Dep. at 50:14-18)  It was J.C. and B.C. and not school employees that determined how many carbohydrates A.C. would consume.  (B.C. Dep. at 57:6-11)  A.C.'s insulin pump would calculate the amount of insulin that would be dispersed to A.C.  The school nurse did not determine the amount of insulin A.C. would receive.  (B.C. Dep. at 55-56:10-21)  The school nurse was required to contact A.C.'s parents before accepting a bolus dosage. (Connie Brown Dep. at 36:13-16)  There was never an occasion when A.C. attended Bon Lin that the nurses changed the basal rates on the pump.  (J.C. Dep. at 32:2-5; 31:15-20; B.C. Dep. at 56-57:22-5)[6]  Although the basal rate settings on A.C.'s pump were initially determined by her physician, J.C. and B.C. would change the basal rates on the pump as they saw fit. (J.C. Dep. at 32:6-11; 31:6-10; B.C. Dep. at 56:22-25)

Based upon A.C.'s high blood sugar levels and the fact that in Ms. Richardson's opinion A.C. was bringing snacks from home with high sugar and carbohydrate levels, Ms. Richardson developed a suspicion during A.C.'s first grade year that A.C. was being "medically abused". (Laura Richardson Dep. at 11-12:19-5)  Ms. Richardson first reported her suspicion that A.C. was being "medically abused" to Principal Williams in or about October of the 2008-09 school year.  (Laura Richardson Dep. at 13:7-19)  Ms. Richardson informed Principal Williams that she

---

[6] The basal rate reflects the amount of basal insulin A.C. was to receive.  (J.C. Dep. at 31:2-5)

wanted to report her suspicion to the Department of Children's Services (DCS) but Principal Williams instructed Ms. Richardson **not** to do so.  (Laura Richardson Dep. at 21-22:20-10)  Ms. Richardson remained concerned about A.C.'s blood glucose levels so she sent B.C. an e-mail asking, "Is there a high BG that is too high?"  B.C.'s response was:  "Anything above 240 is a concern and would need attention."  The e-mail also stated, "300-400 is considered extremely high."  (B.C. Dep., Ex. 10; B.C. Dep. at 109-111:19-1)  J.C. agrees that blood glucose levels of 300-400 would be considered to be extremely high.  (J.C. Dep. at 138:3-17; J.C. Dep., Ex. 16)  During A.C.'s first grade year her blood glucose reading was over 300 approximately 119 times during school days.  (Connie Brown's Affidavit)

In February, 2009, while at home, A.C.'s blood glucose fell so low that J.C. had to administer glucagon to A.C. and A.C. had to go to the hospital.  (J.C. Dep. at 153-154:20-4)  Ms. Richardson learned about the hospitalization and sent B.C. an e-mail expressing her concern.  B.C.'s response, which Ms. Richardson sent to Assistant Principal McClellan, stated that:

> "She came home from the hospital yesterday and she is feeling much better. Today she has endocrinologist visit and will not be able to attend school.  She was looking forward to going back today to see her friends, but I think we are going to wait one more day until she gets a green light from the doctor."

(Tom McClellan's Affidavit)

A.C.'s second grade teacher at Bon Lin was Amy Carver.  A.C.'s test results of August, 2009 reflect that A.C. entered second grade on a "pre-primer basis which means that she was a kindergarten level."  (Amy Carver Dep. at 35:9-21; Amy Carver's Affidavit)  Ms. Carver was concerned about the fact that A.C. was behind in her academics.  (Amy Carver Dep. at 35:9-21)

Ms. Carver was aware of A.C.'s IHP.  Consistent with the IHP Ms. Carver sent a letter to all the parents of students in A.C.'s class notifying them that the classroom was a "peanut-free classroom".  (Amy Carver Dep. at 11:15-24; B.C. Dep. at 99:15-20)  Additionally, Ms. Carver

had a sign posted outside the classroom door notifying parents and students that the classroom was "peanut-free".  (Amy Carver Dep. at 11-12:25-4; B.C. Dep. at 101:13-16)  Ms. Carver and the C.'s had a good relationship.  (Amy Carver Dep. at 10-11:24-5; B.C. Dep. at 71-72:24-4; J.C. Dep. at 175:7-21)

On September 28, 2009 Tom McClellan sent an e-mail to SCBE's Director of Coordinated School Health, Shunji Brown-Woods[7] and SCBE's Director of Student Services, Angela Hargrave notifying them that on that morning he had just received A.C.'s Parent Written IHP but that there were some mistakes, corrections and changes from the previous IHP's that would need to be discussed with the C.'s.  Additionally, Mr. McClellan stated that they would need to discuss with A.C.'s parents the "excessive amount of tardies, to date she has been tardy 24 times (last year-113)."  (Tom McClellan Dep., Ex. 1; Tom McClellan Dep. at 14-15:1-20)

During the month of October, 2009 alone A.C.'s blood glucose levels were outside the blood glucose "target range" set forth in A.C.'s Parent Written IHP multiple times during virtually every school day.  (Tom McClellan's Affidavit; Connie Brown's Affidavit)   On October 27, 2009 Mr. McClellan sent another e-mail to Ms. Brown-Woods and Ms. Duddy in which he stated that:

> "I am sending you a copy of A.C.'s Blood Glucose Monitoring Log for October. The levels are very erratic and Dad is giving various treatment options.  Could you both please review and tell me what you think?"  (Tom McClellan Dep. at 23-25:4-16; Tom McClellan Dep., Ex. 2)

Ms. Brown-Woods informed Mr. McClellan that she agreed that the blood glucose levels were erratic.  (Tom McClellan Dep. at 25:11-16)

On October 27, 2009 another Section 504 meeting was held regarding A.C.  The purpose of the meeting was to review A.C.'s academic progress.  (J.C. Dep., Ex. 14; Tom McClellan's

---

[7] Ms. Brown-Woods has a Bachelor's of Science Degree in Chemistry, a Master's Degree in Health Administration and she is working on her Ph.D., Ed.D.  (Shunji Brown-Woods Dep. at 7-8:18-14)

Affidavit)  The minutes of the meeting reflect that Ms. Carver was concerned that A.C. was not making adequate academic progress.  (J.C. Dep., Ex. 14; Amy Carver's Affidavit)  Based upon A.C.'s August, 2009 STAR reading and math tests, her iStation testing, her classroom work and her teacher's observations, Assistant Principal McClellan suggested that A.C. be tested for a learning disability.[8]  J.C. rejected the suggestion that A.C. be tested and informed Ms. Carver and Assistant Principal McClellan that A.C. did not have a learning disability and that she did not want her to be "labeled".    (J.C. Dep., Ex. 13; Tom McClellan's Affidavit; J.C. Dep. at 112:7-25; 113:19-23; Amy Carver's Affidavit)  Based upon J.C.'s instruction that she did not want A.C. to be tested for a learning disability, she was not tested.  (Tom McClellan's Affidavit)

 School Nurse Brown was extremely concerned about A.C.'s fluctuating blood glucose levels.  In her 42 years as a nurse she had never seen a patient with such sustained erratic fluctuations in blood glucose levels as she had seen in A.C.  (Affidavit of Connie Brown) On multiple occasions Nurse Brown reported her concerns about the welfare and health of A.C. to Principal Williams and Assistant Principal Tom McClellan.  On multiple occasions Nurse Brown also reported to Principal Williams and Assistant Principal McClellan that something must be wrong for A.C.'s blood glucose levels to be so erratic.  (Tom McClellan's Affidavit; Connie Brown's Affidavit; Kay Williams Dep. at 143-144:19-3)  Nurse Brown attempted to speak with A.C.'s endocrinologist about the fluctuations in A.C.'s blood glucose levels; however, J.C. objected to the school nurse contacting A.C.'s endocrinologist for any reason. (Connie Brown's Affidavit; J.C. Dep. at 79-80:19-23)  A.C.'s endocrinologist, Dr. Kashif Latif testified that he was informed by J.C. not to speak with anyone about A.C. or her parents.  (Dr. Kashif Latif Dep. at 54:9-23)  However, Dr. Latif testified that he had no objection to speaking

---

[8] Mr. McClellan's understanding was that state and federal laws required school districts to test any student they believe might have a learning disability.  (Tom McClellan's Affidavit)

with the school nurse and that he regularly speaks to representatives of the schools of his other patients.  (Dr. Kashif Latif Dep. at 54-55:24-2)

Like Nurse Brown, A.C.'s second grade teacher, Ms. Carver was also concerned about A.C.'s blood glucose levels "skyrocketing up and down".  (Amy Carver Dep. at 26:13-20)  Ms. Carver's husband is a paramedic.  When Ms. Carver described A.C.'s fluctuating blood glucose levels to her husband he told her the C.'s are, "lucky that their little girl is still living."  (Amy Carver Dep. at 23:22-25)  In or about October or November of 2009 Ms. Carver informed Principal Williams that if she (the Principal) did not contact the Department of Children's Services, she (Ms. Carver) would.  (Amy Carver Dep. at 32:6-14)  Ms. Carver received training from the school district that "if something could be wrong with the child" it should be reported to the Department of Children's Services (DCS) and that if she did not report her suspicions, she could have "gone to jail". (Amy Carver Dep. at 33:10-16)

On October 30, 2009 when she arrived at school, A.C.'s blood glucose sensor was not working.  (Connie Brown's Affidavit)  At approximately 9:25 a.m. Ms. Carver notified Nurse Brown that A.C. was, "feeling low", so Nurse Brown went to her classroom.  (Connie Brown's Affidavit)  When Nurse Brown arrived in A.C.'s classroom A.C.'s blood glucose tested at 46 mg/dL.  (Connie Brown's Affidavit)  Nurse Brown informed Ms. Carver that they were lucky that A.C. had not "passed out".  (Amy Carver's Affidavit; Connie Brown's Affidavit)  Ms. Carver was so stressed by this news that she began to hyperventilate.  (Amy Carver's Affidavit; Amy Carver Dep. at 28-29:13-24)  Ms. Carver was fearful that the stress related to her concerns about A.C.'s erratic blood glucose levels might jeopardize her (Ms. Carver's) own pregnancy; thus Ms. Carver went to Principal Williams' office to express her concerns.  (Amy Carver Dep. at 28-31:13-1)  When Ms. Carver arrived at Principal Williams' office her blood pressure was

checked and they placed cold towels on her forehead and around her neck to calm her.  (Amy Carver Dep. at 28-31:13-1; Connie Brown's Affidavit)

During the time Ms. Carver was in Principal Williams' office on October 30th, Ms. Carver expressed her concerns about A.C.'s fluctuating blood glucose levels to Ms. Williams. (Amy Carver's Affidavit; Kay Williams Dep. at 107-112:16-4)  By that date Principal Williams' concerns about her responsibility to report suspicions of medical abuse or neglect were heightened due to recent charges that were filed against a Memphis City School Principal who failed to report suspected child abuse.  (Kay Williams Dep. at 115:11-18)  On October 6, 2009 at a school Principals meeting, Principals, including but not limited to Ms. Williams, and others in attendance, were reminded by the SCBE Superintendent of the state law requirement to report suspicions of suspected child abuse or neglect and were warned about the consequences of not reporting.  (Kay Williams Dep. at 124:3-13; Angela Hargrave's Affidavit)  The Superintendent of Shelby County Schools distributed a DVD to Principals and others, including Angela Hargrave, from District Attorney General Bill Gibbons in which General Gibbons stressed the importance of reporting cases of suspected child abuse or neglect and stating the consequences of failing to report.  (Angela Hargrave's Affidavit)  According to District Attorney General Bill Gibbons, "Failure to report is a crime under Tennessee law."  The District Attorney General instructs, "Do not attempt to investigate the incident yourself" and that, "It is not your job to verify that the incident is true."  (Angela Hargrave's Affidavit)

Prior to reporting her concerns about A.C. to the Department of Children's Services on October 30, 2009, Principal Williams sought the advice of SCBE's  Director of Student Services and Section 504 Coordinator, Angela Hargrave about whether to report the concerns that A.C. was being medically abused or neglected to the Department of Children's Services (DCS).

(Angela Hargrave's Affidavit)  Ms. Hargrave contacted a DCS Supervisor whom she knew and described the issues involving A.C.'s fluctuating blood glucose levels.  (Angela Hargrave's Affidavit)  Ms. Hargrave did not mention A.C.'s, J.C.'s or B.C.'s names.  (Angela Hargrave's Affidavit)  Ms. Hargrave was merely inquiring of the DCS Supervisor whether employees of a school district would be under an obligation to report such concerns to DCS.   (Angela Hargrave's Affidavit)  Ms. Hargrave was informed that school district employees were obligated to report their concerns and that it was the job of the DCS, not school district employees, to decide whether their concerns had merit.   Ms. Hargrave informed Ms. Williams of her conversation with the DCS supervisor and Ms. Williams reported her concerns to DCS.  (Angela Hargrave's Affidavit)

Dr. Latif, A.C.'s new endocrinologist, was asked by J.C. to send a letter in response to the DCS report.  At the time he wrote the letter he had only seen A.C. twice.  (Dr. Kashif Latif Dep. at 60-61:4-3)  Dr. Latif began serving as A.C.'s endocrinologist on June 18, 2009.  (Dr. Kashif Latif Dep. at 60-61:1-3)  Dr. Latif spent 45 minutes with A.C. and her mother on June 18.  (Dr. Kashif Latif Dep. at 28:11-19)  B.C. did not attend the visit.  (B.C. Dep. at 116-117:21-2)  Dr. Latif's notes pertaining to A.C.'s June 18, 2009 office visit stated that her Blood Glucose, "is not optimally controlled", that she has, "fluctuating blood glucose levels", and that her A1c is, "not optimal".  (Dr. Kashif Latif Dep., Ex. 8)  The next time Dr. Latif saw A.C. was on August 12, 2009.  (Dr. Kashif Latif Dep. at 13-14:18-5)  He spent 35 minutes with A.C. and her mother on August 12.  (Dr. Kashif Latif Dep. at 28:20-22)  Dr. Latif's notes pertaining to A.C.'s August 12, 2009 visit reflect that A.C.'s blood glucose is "running up and down," that her blood glucose "is not optimally controlled," that A.C. "has fluctuating blood glucose levels" and has "occasional significant hypoglycemia, and A.C.'s A1c is, "not optimal".  (Dr. Kashif Latif Dep.,

Ex. 13; J.C. Dep. at 72:12-24)  The only blood glucose pump logs Dr. Latif had reviewed by A.C.'s August 12, 2009 visit were dated June 4 through June 17, 2009, June 26, 2009 through July 9, 2009 and July 28, 2009 through August 11, 2009.  (Dr. Kashif Latif Dep. at 19:6-15)

After having spent only 1 hour 20 minutes with A.C. and her mother, and not ever having met B.C., Dr. Latif wrote a letter dated November 12, 2009 stating that A.C.'s diabetes care from her family has been, "very appropriate", that, "her parents are following protocol for diabetes control and insulin pump management", and "they also make sure that she attends her appointments regularly".  (Dr. Kashif Latif Dep., Ex. 10)[9]  In his deposition Dr. Latif testified that in his opinion A.C.'s goal A1c for her age was 8%.  (Dr. Kashif Latif Dep. at 47:17-20)  Dr. Latif testified that prior to writing the November 12, 2009 letter, A.C.'s A1c levels during her June and August office visits were 8.7% and 8.2% respectively.  (Dr. Kashif Latif Dep. at 47-48:21-23)  Despite the fact that A.C.'s A1c levels were clearly above the goal Dr. Latif testified was the goal for A.C., he wrote in the letter that A.C.'s "Hemoglobin A1c is at goal for her age." (Dr. Kashif Latif Dep. at 47-48:17-25; Dr. Kashif Latif Dep., Ex. 10)  After only reviewing a few days of pump log data and visiting with A.C. and her mother for only 1 hour 20 minutes total, Dr. Latif wrote, "there is no neglect in caring for this disease."  (Dr. Kashif Latif Dep., Ex. 10; Dr. Kashif Latif Dep. at 60-61:16-3; 19:6-15)  Dr. Latif admits that he has never been to Bon Lin, he has never spoken to any employee of the SCBE about A.C., nor has he ever been interviewed by the Department of Children's Services about A.C.  (Dr. Kashif Latif Dep. at 52-54:18-8)

---

[9] The A1c level is the measurement of the amount of glucose that bonds to hemoglobin and gives an assessment of the average blood sugar control during the 90 days prior to the test.  (Dr. Kashif Latif Dep. at 39-40:21-1) According to Dr. Latif, "the higher the A1C, the greater the risk of diabetic complications such as eye, kidney, cardiovascular and nervous system disease."  (Dr. Kashif Latif Dep. at 40:1-4)

According to Dr. Latif, it is important to avoid low blood glucose levels in a young child whose brain is developing, "because if you have repeated low blood glucose levels, that can cause some neurological compromise of these children and it can affect their eventual height too, as an adult." (Dr. Kashif Latif Dep. at 44-45:22-2)  According to Dr. Latif a blood glucose level of 36 would be considered to be extremely low and could cause a child to lose consciousness or have some other adverse symptoms.  (Dr. Kashif Latif Dep. at 50:18-25)  A.C.'s blood glucose level was 36 by the second day of her second grade year.  (Connie Brown's Affidavit)  On October 26, 2009, the day before Assistant Principal McClellan sent the previously referenced e-mail to Nurse Duddy and the Director of Coordinated School Health, Shunji Brown-Woods expressing concerns about A.C.'s erratic blood glucose levels, her blood glucose level was 36. (Connie Brown's Affidavit)  Dr. Latif also testified that if A.C.'s blood glucose was tested and it was high and then it was tested again and it was even higher that would be cause for concern for the school.  (Dr. Kashif Latif Dep. at 64-65:2-3)  Such was the case on the following dates from the first day of school for the 2009-2010 school year through October 30, 2009:  August 11, August 12, August 13, August 17, August 19, August 20, August 21, August 24, August 27, August 28, September 10, September 11, September 14, September 15, September 16, September 18, September 22, September 24, September 29, October 1, October 2, October 14, October 19, October 23, October 26, October 27, October 28, and October 30.  (Connie Brown's Affidavit)  According to Dr. Latif, if A.C.'s blood glucose level was running in the 40's that should cause the school concern.  (Dr. Kashif Latif Dep. at 65:8-11)  Also according to B.C. a blood glucose level of 48 would be low for A.C.  (B.C. Dep. at 123:23-24)  A.C.'s blood glucose level was in the 40's or below on the following dates between August 10, 2009 through October 30, 2009:  August 11, August 18, August 26, September 30, October 9, October 19, October 22,

October 26, and October 30.  (Connie Brown's Affidavit)  When asked what his blood glucose "comfort level" was for A.C., B.C. replied, "it's supposed to be on 70."  (B.C. Dep. at 124:13-14)  Between August 10, 2009 through October 30, 2009 A.C.'s blood glucose levels fell below 70 on 33 occasions.  (Connie Brown's Affidavit)

According to B.C. and J.C. a blood glucose level of over 300 is extremely high.  (J.C. Dep. at 138:10-12; B.C. Dep. at 123:17)  Between August 10, 2009 and October 30, 2009 A.C.'s blood glucose level was over 300 on the following dates:  The second day of school, *i.e.* August 11, August 14, August 18, August 21, August 24, August 25, August 27, August 28, September 10, September 11, September 14, September 15, September 17, September 18, September 21, September 22, September 23, September 24, September 29, October 1, October 5, October 6, October 8, October 14, October 15, October 16, October 19, October 20, October 21, October 22, October 23, October 26, October 27, October 28, and October 30.   (Connie Brown's Affidavit)

Throughout the time that A.C. attended Bon Lin, her parents had good rapport with A.C.'s teachers.  (B.C. Dep. at 71-72:24-4; J.C. Dep. at 175:7-21)  B.C. testified that he could not think of a single SCBE employee that was ever disrespectful to him.  (B.C. Dep. at 78:1-13)  B.C. had a business-type relationship with Assistant Principal McClellan and the school nurse.  (B.C. Dep. at 74:3-5; 77:10-17)  Mr. McClellan was never disrespectful to B.C.  (B.C. Dep. at 77:18-20)  The only interactions B.C. had with SCBE employees outside of those assigned to Bon Lin were those SCBE employees that attended A.C.'s Section 504 meetings.  (B.C. Dep. at 80-81:15-11)  The SCBE non-school based employees who attended A.C.'s Section 504 meetings were John Aitken, who was Assistant Superintendent, Director of Student Services and Section 504 Coordinator, Angela Hargrave, and Director of Coordinated School

Health, Shunji Brown-Woods.  (Tom McClellan's Affidavit; B.C. Dep. at 78-81:14-11)   The only meeting Mr. Aitken attended was in December of 2008.  (B.C. Dep. at 103:5)  According to B.C., Mr. Aitken was not rude to him, "he was only an observer".  (B.C. Dep. at 104-105:25-2)  Also according to B.C., Angela Hargrave was A.C.'s advocate.  (B.C. Dep. at 79:15)   As for J.C.'s relationship with SCBE employees, according to B.C., J.C. thinks people in general are against her; especially women.  (B.C. Dep. at 130:4-16)

B.C. was asked during his deposition what proof there was that the SCBE through its employees retaliated against J.C., A.C. and him.  His response was, "Well, obviously, the retaliation is based on this — this whole litigation we're having is when they contact DCS or so."  (B.C. Dep. at 84:15-19)  J.C. was asked the same question.  Her response was that the acts of retaliation were as follows:  (1) In 2007 Kay Williams left the voicemail message that is recounted in her Complaint; (2) there were "negative reactions" when she would bring up a concern, (3) the suggestion that A.C. be tested for a learning disability and (4) not controlling people from bringing peanut products into the school.  (J.C. Dep. at 121-124:20-9)

Beginning with the 2010-2011 school year A.C.'s parents withdrew A.C. and C.C. from Bon Lin and enrolled them in a home school program that does not require standardized testing and which only requires that they report the children's grades one time per year.  (J.C. Dep. at 109-112:1-6)  The home school program does not provide a curriculum; the curriculum is selected by J.C. and B.C.  (J.C. Dep. at 110:2-7)  Neither J.C. nor B.C. has had any education training.  (J.C. Dep. at 114:16-19)  At home A.C. is permitted to check her own blood glucose levels, operate her insulin pump and deliver insulin to herself.  (B.C. Dep. at 117-118:9-24)

### III. **LEGAL ARGUMENT**

This lawsuit arises under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Lyons v. Metropolitan Government of Nashville and Davidson County*, 416 Fed. Appx. 483, 2011 WL 1042271 (March 22, 2011, C.A. 6 (Tenn.))

The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact at issue in the case. *Uhuru v. City of Memphis*, 2009 WL 3255194, 6 (W.D. Tenn. 2009), <u>citing</u> *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). This may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Uhuru* at 6, <u>citing</u> *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 265 (1986).

In response, the nonmoving party must go beyond the pleadings and present "significant probative evidence" to demonstrate that "there is more than some metaphysical doubt as to the material facts." *Uhuru* at 6, <u>citing</u> *Moore v. Philip Morris Cos.,* 8 F.3d 335, 340 (6th Cir. 1993). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Uhuru* at 6, <u>citing</u> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Section 504 of the Rehabilitation Act prohibits discrimination under any program or activity receiving federal financial assistance by reason of disability. It is illegal to "discharge,

intimidate, retaliate, threaten, coerce or otherwise discriminate against any person" for seeking to enforce Section 504. *Sudekamp v. Fayette County Board of Education,* 2005 WL 2137739, 2 (2005, USDC, KY) aff'd. 6th Cir., 193 Fed. Appx. 585, 2006 WL 2472905 (C.A. 6 KY).

> "The ADA prohibits discrimination based on a person's opposition to a violation of the ADA. 42 U.S.C. § 12203(a). Furthermore, a person who aids another individual in exercising rights guaranteed under the ADA is protected from coercion, intimidation, threats or interference. 42 U.S.C. § 12203(b)." *Sudekamp* @ 4.

> "To state a *prima facie* case for retaliation, the plaintiff must establish that (1) she was engaged in protected activity; (2) she suffered adverse action; and (3) the adverse action was taken because of the protected activity. To satisfy the third element, the plaintiff must show that the defendant knew of the protected activity." *Sudekamp* @ 2.

To establish a causal connection between protected activity and alleged adverse actions Plaintiffs must produce sufficient evidence from which an inference could be drawn that the alleged actions would not have been taken had the Plaintiffs not engaged in protected activity.[10] *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); see also *Williams v. Pat Salmon & Sons, Inc.,* slip copy, 2011 WL 830384, 5 citing *Nguyen.*

If a *prima facie* case is made, then the burden shifts to the defendant to put forth a legitimate, non-discriminatory reason for the adverse action. If the defendant establishes an alternative, permissible justification, then the plaintiff must prove that the defendant's explanation is a mere pretext for its discriminatory motive. *Sudekamp* @ 2. Plaintiffs cannot make out a *prima facie* case of retaliation because they cannot establish that they suffered an adverse action or that even if *arguendo* an adverse action was taken, the action was taken because of the alleged protected activity.

---

[10] The SCBE maintains that any alleged adverse actions taken prior to the one year statute of limitations for filing retaliation claims under the ADA and Section 504 of the Rehabilitation Act are time barred.

In the *Sudekamp* case the Plaintiff's son, J.K. was identified as having a disability under the Individuals with Disabilities in Education Act ("IDEA") in 1997. During the course of time he attended Defendant's schools, the parties disagreed on the development and implementation of the student's IEPs and about how the school district would accommodate the student's disability. The parties' disagreements resulted in J.K.'s parents requesting a due process hearing pursuant to the IDEA in October 2003. On November 10, 2003 a school district representative notified Plaintiff that J.K. was a habitual truant, having amassed 16 unexcused absences. When the Plaintiff failed to correct the truancy issue, the school district filed a criminal complaint against J.K.'s parent pursuant to the state's truancy law. The Plaintiff alleged that the school district violated Section 504 by filing a criminal truancy complaint in retaliation for her request for a due process hearing under the IDEA. The Court held that there was no evidence to support the conclusion that any of the defendant's employees took an adverse action against the Plaintiff that was motivated by her protected activity.

One of the findings of the Court in *Sudekamp* was that the school district employees responsible for initiating the criminal proceedings were not aware of the due process hearing request; thus the Plaintiff could not prove that the adverse action was taken because of the protected activity. In the case at bar, according to J.C., Principal William's leaving a voicemail message was a retaliatory act for J.C. having filed an OCR complaint; however, J.C. admits that she had not even filed the OCR complaint by the time Ms. Williams left the voicemail message. (J.C. Dep. at 125:7-12) Principal Williams also testified that she was not advised that an OCR complaint had been filed until late September, 2007. (Kay Williams Dep. at 71:6-11) Additionally, assuming *arguendo* that the act of leaving the voicemail message could be

considered a retaliatory act, which Defendant maintains it cannot, the act was a discrete act which should be considered to be time-barred in terms of this lawsuit.

The issue of proximity in time between protected activity and adverse action may give rise to causal connection but temporal proximity alone is insufficient to establish a causal connection for a retaliation claim. *Mason v. Huttig Sash & Door*, 26 Fed. Appx. 531, 2002 WL 104803 (6[th]Cir. 2002). During his deposition when B.C. was asked what proof he has that SCBE retaliated against Plaintiffs, his response was, "Well, obviously, the retaliation is based on this – this whole litigation we're having is when they contacted DCS or so." (B.C. Dep. at 84:15-19) Plaintiffs cannot establish a causal connection between the 2007 report to the Office of Civil Rights and the 2009 DCS report. The Sixth Circuit has held six weeks between the protected conduct and the adverse action to be insufficient to establish a causal connection. *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 317 (6th Cir. 2001); see also *Jividen v. University of Tennessee,* slip copy, 2011 WL 2682107, 9 (W.D. Tenn. July 11, 2011) citing *Skrjanc.*

Also, in the *Sudekamp* case the court held that even if the Plaintiff had made a *prima facie* retaliation case the Defendant would still be entitled to summary judgment, because the Plaintiff could not show that the Defendant's reliance on state truancy laws to justify its pursuit of criminal sanctions was a mere pretext for a discriminatory motive. Under Tennessee law, a school representative is required to immediately report any suspicion that a child has been abused physically or sexually. (T.C.A. § 37-1-403, *et seq.*; Angela Hargrave's Affidavit) According to District Attorney General Bill Gibbons, "Failure to report is a crime under Tennessee law."[11] (Angela Hargrave's Affidavit) District Attorney General Gibbons instructs, "Do not attempt to investigate the incident yourself," and that, "It is not your job to verify that

---

[11] T.C.A. § 37-1-410 provides that persons that make reports of child abuse and neglect that are acting in good faith are immune from suit.

the incident is true." (Angela Hargrave's Affidavit)  A mere two weeks prior to Ms. Williams contacting the Department of Children's Services, the Superintendent of the SCBE informed school Principals that charges had recently been filed against a Memphis City School Principal for failing to report suspected child abuse and reiterated to Principals that it was their duty to report not just proven cases of abuse, but also suspicions of abuse.  (Angela Hargrave's Affidavit)  Further proof of the legitimate and non-discriminatory reason for reporting suspicions of medical neglect to DCS is the fact that before Principal Williams contacted the DCS on October 30, 2009, she sought the advice of SCBE's Director of Student Services and Section 504 Coordinator, Angela Hargrave.   Ms. Hargrave contacted a supervisor with DCS before the charge was filed, without disclosing A.C., J.C. or B.C.'s identities, to ensure that the circumstances she described of A.C. having erratic blood sugar levels constituted cause for filing a DCS complaint; she was told by the DCS Supervisor that a charge should be filed.  (Angela Hargrave's Affidavit)  Additionally, it is undisputed that Ms. Richardson and Ms. Carver, people with whom B.C. and J.C. admit they had a good relationship, both informed Ms. Williams that they believed a report needed to be made to DCS.  (Laura Richardson Dep. at 13:7-19; 21-22:20-6; Amy Carver Dep. at 32:6-9)  When Ms. Carver came to her office on October 30, 2009 she was stressed due to her concern for A.C.'s health.  (Amy Carver Dep. at 28-31:13-1)  Nurse Brown had also reported to Principal Williams and Assistant Principal McClellan on multiple occasions her concerns that A.C.'s health was in jeopardy and that there must be something wrong for A.C.'s blood glucose levels to be so erratic.  (Connie Brown's Affidavit; Tom McClellan's Affidavit; Kay Williams Dep. at 143-144:19-3)  Ms. Williams was in a catch-22; report the C.'s and make them angry or not report the C.'s and risk being arrested as was her

counterpart in the Memphis City School system.  The SCBE maintains that if following the law can be considered to be retaliatory, our system of justice is inherently flawed.

The SCBE was justified in being concerned about A.C.'s health.  The Plaintiffs' own proffered expert testified that repeated low blood sugar levels in a young child could cause neurological compromises and that school employees would have cause to be concerned if A.C.'s blood glucose level was "running in the 40's".  (Dr. Kashif Latif Dep. at 44-45:22-2; 65:8-11)  From August 10, 2009 to October 30, 2009 A.C.'s blood glucose level was in the 40's or below on the following dates:  August 11, August 18, August 26, September 30, October 9, October 19, October 22, October 26, and October 30.  (Connie Brown's Affidavit)  Dr. Latif also testified that the school should be concerned if A.C.'s blood glucose level was high and rose even higher at the next test.  (Dr. Kashif Latif Dep. at 64-65:2-3)  Between August 10, 2009 and October 30, 2009, such was the case on August 11, August 12, August 13, August 17, August 19, August 20, August 21, August 24, August 27, August 28, September 10, September 11, September 14, September 15, September 18, September 22, September 24, September 29, October 1, October 2, October 14, October 19, October 23, October 26, October 27, October 28, and October 30.  (Connie Brown's Affidavit)  J.C. and B.C. agree that a blood glucose level of over 300 is "extremely high".  (J.C. Dep. at 138:10-12; B.C. Dep. at 123:17)  Between August 10, 2009 and October 30, 2009 A.C.'s blood glucose level exceeded 300 on the following dates: The second day of school, *i.e.*, August 11, August 14, August 18, August 21, August 24, August 25, August 27, August 28, September 10, September 11, September 14, September 15, September 17, September 18, September 21, September 22, September 23, September 24, September 29, October 1, October 5, October 6, October 8, October 14, October 15, October 16, October 19, October 20, October 21, October 22, October 23, October 26, October 27, October

28, and October 30.  (Connie Brown's Affidavit)  When asked what his blood glucose "comfort level" was for A.C., B.C. replied, "it's supposed to be on 70."  (B.C. Dep. at 124:13-14) Between August 10, 2009 and October 30, 2009 A.C.'s blood glucose level fell below 70 on 33 occasions.  (Connie Brown's Affidavit)  The concerns by the school staff including Principal Williams were legitimate reasons for Ms. Williams to contact DCS.

Plaintiffs also cannot prove that offering to test A.C. for a learning disability is retaliatory.  It is not only impossible for Plaintiffs to satisfy the element of proving that an adverse action was taken, they also cannot satisfy the element of proving a causal connection between an adverse action and protected activity.  First, it should be noted that there was no adverse action taken:  the offer was made to test A.C. and J.C. rejected the offer because she did not want A.C. to be "labeled", and she did not believe A.C. had a learning disability, thus, A.C. was not tested.  (Tom McClellan's Affidavit)  Second, the Individuals with Disabilities Act and Tennessee law provide that school districts are under an obligation to identify students and test students in order to determine whether the child is disabled; Assistant Principal McClellan was aware of these legal requirements when he offered to test A.C. for a learning disability.  (T.C.A. § 49-10-108; 20 U.S.C., § 1412(a)(3); Tom McClellan's Affidavit).  Had the school district not offered to test A.C. for a learning disability they would have been in violation of the law.  Third, it is impossible to say that the SCBE did not have a legitimate, non-discriminatory reason for offering to test A.C. for a learning disability.  From the time A.C. entered kindergarten at Bon Lin, J.C. and B.C. recognized that A.C. was behind academically.  (B.C. Dep., Ex. 8; B.C. Dep. at 93-95: 11-2; J.C. Dep. at 181:7-19; J.C. Dep., Ex. 29)  Prior to the October 27, 2009 suggestion that A.C. be tested for a learning disability, in August, 2009 the results of A.C.'s "STAR" Math and reading tests indicated that when she entered second grade she was

performing at a kindergarten level.  (Amy Carver's Affidavit)  Tom McClellan's offer to test A.C. for a learning disability was based upon A.C.'s STAR reading and math tests, her iStation testing, her classroom work and her teacher's observations; all of which are legitimate, non-discriminatory reasons for offering to test A.C. for a learning disability.  (Tom McClellan's Affidavit)

Plaintiffs' claim that because an occasional person would come to school with a peanut product this constitutes retaliation is specious.  According to J.C. everywhere she takes A.C. she is exposed to peanuts or peanut products, including but not limited to hotels, airplanes, cruise ships, movie theaters, *etc.*  (J.C. Dep. at 98-100:8-11; B.C. Dep. at 34-36:5-9)  The minutes from the August 23, 2007 meeting reflect that J.C. informed the meeting participants that A.C. has never had an allergic reaction to peanuts; despite this fact, the school district took measures to ensure that A.C. was not exposed to peanuts.  (Kay Williams Dep., Ex. 3; Tom McClellan's Affidavit)  Each of A.C.'s teachers placed notices outside their classrooms indicating that the classrooms were "peanut-free", the parents of the students in A.C.'s classrooms were sent letters advising them that there was a student with peanut allergies in the class and that the classroom was to be peanut-free, school administrators monitored the lunch room to ensure that A.C. was not seated next to students with peanut products in their lunches, and cafeteria employees wiped down all tables before A.C.'s class arrived in order to ensure that no remnants of any peanut product were picked up by A.C. or any of her classmates.  (J.C. Dep., Ex. 10; Amy Carver Dep. at 11:15-24; 11-12:25-4; Amy Carver's Affidavit; B.C. Dep. at 99:15-20; 101:13-16; Tom McClellan's Affidavit)  When J.C. was asked in her deposition to state the dates of when persons brought peanut products into A.C.'s presence at school or the names of those persons, she could not remember when the incidents occurred and she could only remember the names of 3 people

who brought peanut products in A.C.'s presence during the entire time she attended Bon Lin. (J.C. Dep. at 129:12-14)  The SCBE maintains that without knowing the dates upon which persons allegedly brought peanut products into the school the Court cannot determine whether the claims are time barred.  Most confounding however is how people occasionally on unspecified dates, bringing peanut products into A.C.'s presence could be deemed to constitute retaliation by the SCBE; particularly since by Plaintiffs' own admissions, the SCBE took measures to try to limit A.C.'s exposure to peanut products and since A.C. comes into contact with peanut products wherever she goes.  (J.C. Dep. at 98-100:8-11; J.C. Dep., Ex. 10; B.C. Dep. at 34-36:5-9; 99:15-20)

Plaintiffs' allegation that "negative reactions" from school district employees to concerns of the C.'s constitutes retaliation is amorphous and non-specific.  In the *Sudekamp* case, the parents and the school district often disagreed about the student's IEP; however, having a disagreement is not against the law.  Additionally, "negative reactions" do not necessarily result in adverse actions being taken.  If having a "negative reaction" in the course of a Section 504 or IEP process was considered to be retaliatory, virtually every Section 504 or IEP meeting that ever occurred in any school district in America would result in a retaliation claim.  The purpose of Section 504 and IEP meetings is to provide a forum to engage in discussions and hopefully reach a compromise among the team members that may have differing opinions.  Plaintiffs have failed to assert that a "negative reaction" to their "concerns" resulted in any adverse action or that even if *arguendo* an adverse action was taken, that there was a correlation between the adverse action and the Plaintiffs protected activity.

## IV. <u>CONCLUSION</u>

This entire case is based upon the C.'s anger that Principal Williams contacted the DCS to report Nurse Brown's, Ms. Carver's, Ms. Richardson's, Mr. McClellan's and her concerns about A.C.  This is a lawsuit solely alleging retaliation under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act.  In order to make out a *prima facie* case of retaliation the Plaintiffs bear the burden of proving that an adverse action occurred and that a causal connection exists between protected activity and an adverse action.  Even assuming that the facts alleged in the Complaint are true, the Plaintiffs cannot make out a *prima facie* case of retaliation; however, even if they could satisfy all of those elements, the SCBE at every turn had a legitimate, non-discriminatory reason for all of their actions, therefore Summary Judgment in the SCBE's favor is justified.  For these reasons and the reasons set forth herein, Defendant, SCBE respectfully requests that its Motion for Summary Judgment be granted.


Respectfully submitted,


    /s/ Valerie B. Speakman, Esquire   .
**Valerie B. Speakman, General Counsel**
**BPR No. 014670**
**SHELBY COUNTY BOARD OF EDUCATION**
**160 South Hollywood Street, Room 250**
**Memphis, Tennessee  38112-4801**
**Telephone:     901 – 321-2662**
**Facsimile:     901 – 321-2667**
**E-mail:          vspeakman@scsk12.org**
**Counsel for Defendant,**
**SHELBY COUNTY BOARD OF EDUCATION**

## CERTIFICATE OF SERVICE

I hereby certify that on the __18th__ day of ___August___, 2011, a true and correct copy of the foregoing **DEFENDANT, SHELBY COUNTY BOARD OF EDUCATION'S, MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the U.S. District Court using the CM/ECF system; and by electronic means through the Court's ECF System to:  Justin S. Gilbert, Esquire and Jessica Farris Salonus, Esquire (Attorneys for Plaintiffs), at jgilbert@gilbertfirm.com and jsalonus@gilbertfirm.com, Gilbert, Russell & McWherter, PLC, 101 North Highland Avenue, Jackson, Tennessee  38301

_____/s/ Valerie B. Speakman, Esquire___.
**Valerie B. Speakman**